IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| HARLEY SITSLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-CV-592-PJC |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Claimant, Harley Sitsler ("Sitsler"), pursuant to 42 U.S.C. § 405(g), requests judicial
review of the decision of the Commissioner of the Social Security Administration
("Commissioner") denying Sitsler's application for disability benefits under the Social Security
Act.  In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed
before a United States Magistrate Judge.  Any appeal of this order will be directly to the Tenth
Circuit Court of Appeals.  Sitsler appeals the decision of the Administrative Law Judge ("ALJ")
and asserts that the Commissioner erred because the ALJ incorrectly determined that Sitsler was
not disabled.  For the reasons discussed below, the Court **AFFIRMS** the Commissioner's
decision.

### Claimant's Background

At the time of the hearing before the ALJ on September 18, 2007, Sitsler was 30 years
old.  (R. 659).  He completed sixth grade, and he had unsuccessfully attempted to take the
examination for a GED once.  (R. 667).

Sitsler testified that the last time he worked was in 1998 when working for a company

that made roofing paper.  (R. 657).  He quit due to pain in his back, going down his left leg, which was made worse when he lifted heavy items at work.  (R. 657-58).  After that, he unsuccessfully attempted to work for a tree service for one day, but was unable to do so due to the same pain when he lifted heavy items.  (R. 658).

At the 2007 hearing, Sitsler testified that he could lift 10 pounds and he could sit for about an hour or longer before he would have to stand up because he would get stiff.  *Id.*  He understood that his problems with his back were arthritis and scoliosis.  (R. 658-59).  He testified that he also had mental issues with anxiety and obsessive compulsive disorder.  (R. 659).

Sitsler had not worked since 1998, but he helped take care of his two children -  a 5-year-old and a 2-year-old.  (R. 659-61).  His mother helped him take care of the children while his wife was at work.  (R. 661).

Sitsler testified that he had a tick bite in 2003 that had eventually resulted in positive tests for both Lyme disease and Rocky Mountain spotted fever. (R. 662).  From that experience, he still had symptoms of headaches, dizziness, and spots in his vision at the time of the 2007 hearing.  (R. 662-63).  He had headaches every day for which he took Tylenol.  (R. 663).  The dizziness occurred when he stood up, and he would sometimes momentarily "go black," and this would happen every couple of days.  *Id.*  Exposure to the sun for "very long" would cause painful bursting of blood vessels in his skin.  (R. 663-64).

In addition to the pain in his back, Sitsler would experience pain in his neck most of the time.  (R. 664).  Sitsler testified that he had arthritis in both hips, they would pop and crack, and he would get stiff if he sat for very long.  (R. 664-65).  If he walked for very long, his left leg would swell down to his toes, which happened almost every day.  (R. 665).  He also had muscle spasms that would make him need to sit down.  *Id.*  He had pain in his feet that made walking

difficult.  *Id.*

Sitsler testified that he had arthritis in both hands, and he often dropped things with his right hand.  (R. 666).  He also had nerve damage in his right hand, and he could not feel anything with the tips of his thumb and of his first two fingers.  (R. 667).

He had trouble sleeping because of a bladder and frequent urination problem.  (R. 669).  He drove a car sometimes, but not much.  *Id.*  Driving to the hearing was the longest he had recently driven, and he experienced problems with his left leg swelling a bit.  (R. 669-70).  He did some housework, including dusting and vacuuming.  (R. 670).  He could not mop because it required too much bending.  *Id.*  He sometimes picked up his 2-year-old child, but not much.  *Id.*

Sitsler traced his anxiety problems back to 1995 when his father died in a car accident, and Sitsler testified that he had isolated himself since that time.  (R. 670-71).  He sometimes would have panic attacks that felt like a heart attack, but he tried to avoid places where that would happen.  (R. 671).  He had high blood pressure and took daily medication for it.  (R. 671-72).

Sitsler testified that he had been diagnosed with obsessive compulsive disorder and one example was that he would re-check the doors and windows at night to make sure that they were locked.  (R. 673).  He had constant intrusive thoughts of someone trying to break in to hurt his family.  *Id.*

Sitsler was treated on many occasions by three clinics, Salina Community Clinic, W. W. Hastings Indian Hospital in Tahlequah, and Sam Rider Jay Community Clinic from 1996 through 2007.  (R. 146-63, 178-344, 443-535).  The Court has attempted to integrate a summary of Sitsler's treatment by these three clinics in chronological order to make the medical evidence as clear as possible.   On October 28, 1996, Sitsler complained of shoulder and back pain.  (R.

163).  The space for "purpose of visit" was listed as arthralgia, and Sitsler was given prescription medications.  *Id.*  There were follow up visits on November 5, 1996 and January 7, 1997  (R. 161-62).  On January 13, 1997, arthalgia and palpitations were noted as the purposes of the visit, with a follow up visit on February 4, 1997. (159-60).  On May 15, 1997, the purpose was noted as palpitations.  (R. 157).  Sitsler was seen at the emergency department of the Indian Hospital in Tahlequah, Oklahoma with a chief complaint that his heart was racing, and the purpose of the visit was stated as costochondritis.  (R. 185).  The date of this record is not clear, but it could be January 1998.  *Id.*  On February 20, 1998, Sitsler complained of lower back pain.  (R. 311).  A February 1998 radiology report was unremarkable for Sitsler's lumbosacral spine.  (R. 317).  There were follow up visits on March 26, April 17, and May 6, 1998.  (R. 307-09).  A May 1998 report showed very mild hypertrophic changes and posterior disk space narrowing at L1-L2.  (R. 317).  Chest x-rays in 1998 showed no acute chest disease.  (R. 249, 316).  He was seen again on August 1, 1998 with a chief complaint that his sides hurt.  (R. 184).

Sitsler was seen at the Jay Community Clinic on August 3, 1998 for the complaint of side pain.  (R. 306).  On July 23, 1999, Sitsler complained of chest pain when he moved his arm.  (R. 304).   On August 12, 1999, Sitsler complained of pain in his right upper chest area, and the purpose of the visit was noted as costochondritis.  (R. 153).   On November 4, 1999, Sitsler complained of left hip pain.  (R. 303).  On January 27, 2000, Sitsler complained of left leg pain and swelling.  (R. 302).  On May 9, 2000, Sitsler complained of lightheadedness and seeing stars when standing up or turning his head.  (R. 300).  The purpose of the visit was described as positional vertigo.  *Id.*  On May 12, 2000, the purpose of visit was noted as cephalgia.  (R. 299).  On May 16, 2000, the purpose of the visit was described as non-cardiac chest pain that was resolved.  (R. 183).

On September 20, 2000, Sitsler complained of dizziness and lightheadedness, with a follow up visit on September 29, 2000.  (R. 220-21).   On October 11, 2000, Sitsler complained of left hip pain, along with pain of his knees and ankle, and the purpose of the visit was noted as chronic hip pain.  (R. 152).  A visit on October 13, 2000 was for a complaint of blackouts, and the purpose of the visit was stated as "normal exam finding."  (R. 223).  Another visit occurred on November 3, 2000, for dizziness and lightheadedness.  (R. 219).   There were recheck appointments for the hip pain on November 8, 2000, December 20, 2000, and January 2, 2001. (R. 149-51).  On May 23, 2001, Sitsler again complained of low back pain.  (R. 148).  On July 11, 2001, the purpose of the visit was stated as chronic back pain.  (R. 147, 652).

Sitsler was seen on January 25, 2002 for refill of medications.  (R. 218).  On February 20, 2002, Sitsler was seen for hip pain, with follow up visits for hip pain or medication refills on March 8, March 26, April 3, and May 10, 2002.  (R. 208, 210-11, 213-14).  On May 24, 2002, in addition to hip pain, Sitsler complained of right upper quadrant abdominal pain.  (R. 207).  On June 13, 2002, he was seen for pain under his right rib.  (R. 298).  On June 19, 2002, Sitsler apparently went to two different clinics with a complaint of right upper quadrant pain.  (R. 180, 297).  There were additional visits or tests done on June 27, July 8, July 18, and August 5, 2002 (R. 198, 201, 203-04, 206).  On September 4, 2002, Sitsler "backed out" of an esophagogastroduodenoscopy (EGD) procedure.  (R. 197).  On October 9, 2002, Sitsler complained of pain in most joints, including both hips, right ankle, back and hands.  (R. 296). Laboratory tests in October 2002 were within normal limits for rheumatoid arthritis factor.  (R. 336).  Tests in November 2002 were negative for hepatitis.  (R. 334).  A doctor's visit on November 5, 2002 noted elevated liver enzymes, and a second record on November 14, 2002 said it was "resolving."  (R. 293-94).  On December 10, 2002, Sitsler presented for sickle cell

testing and due to pain in his right hand.  (R. 292).  Sickle cell anemia testing was negative.  (R. 535).  On December 12, 2002, Sitsler called with a complaint of tremors.  (R. 289)

In 2002, a series of x-rays were taken.  Chest x-rays on May 24, 2002, and June 19, 2002 were normal.  (R. 242, 244).  On January 25, 2002, x-rays of Sitsler's left hip showed "either a developmental spur of the lesser trochanter or post traumatic spur of the lesser trochanter" and otherwise an unremarkable x-ray.  (R. 248).   Wrist x-rays taken January 27, 2002 and February 12, 2002 were unremarkable and normal.  (R. 246-47).  An x-ray of Sitsler's right hip on February 20, 2002, was unremarkable.  (R. 245).  An abdomen x-ray on May 24, 2002 was unremarkable.  (R. 243).  A sonogram of Sitsler's right upper quadrant abdomen was unremarkable except for a "hyperechogenic" liver on July 8, 2002.  (R. 241).  An upper GI series on July 18, 2002 was unremarkable except for probable duodenitis.  (R. 240).  X-rays in October 2002 showed negative lumbar spine, negative right ankle, normal wrists, negative hands, and a bone island in Sitsler's left hip that was described as probable for no clinical significance.  (R. 315).

On January 2, 2003, Sitsler was seen for follow up of his left hand tenderness and for blood in his stool.  (R. 288).   On June 28, 2003, Sitsler presented with a tick bite.  (R. 196).  Sitsler returned on June 30, 2003, with complaints of vomiting with chills and aches.  (R. 195).  On August 20, 2003, Sitsler complained of pain in his arm and hand, and the purpose of the visit was described as hypertension and carpal tunnel.  (R. 283).  On September 16, 2003, Sitsler complained of arthralgias and easy bruising since the June tick bite.  (R. 192).  On January 12, 2004, Sitsler was seen for a routine appointment for follow up of his hypertension, and he complained of left hip pain.  (R. 281).  On January 16, 2004, Sitsler complained of a sore arm after receiving a pneumonia vaccination, and he had been vomiting blood.  (R. 189).  He was

apparently diagnosed as having a virus.  *Id.*  On January 20, 2004 he went to another clinic with these complaints.  (R. 279).  On February 25, 2004, Sitsler complained that both hips and his lower back hurt.  (R. 274).  On March 1, 2004, Sitsler complained that he was passing blood in stools.  (R. 187-88).  On March 26, 2004, Sitsler was seen for follow up of anxiety and back pain.  (R. 272).  On April 22, 2004, Sitsler complained of dark-black blood in stool, and he was seen for that as well as anxiety and his back pain on April 26, 2004.  (R. 270-71).  On May 26, 2004, Sitsler complained of headaches.  (R. 268).  Tests were done in May 2004 for Lyme disease and Rocky Mountain spotted fever.  (R. 322).  On June 4, 2004, a doctor's record shows that test results were received, and the purpose of visit was filled out as Lyme disease and Rocky Mountain spotted fever.  (R. 267).  It appears that Sitsler was started on antibiotics.  *Id.*  Repeated tests in June 2004 appear to be negative.  (R. 319).   Sitsler was seen on June 22, 2004 for a rash with follow up visits on July 20, and August 10, with that visit also noting depression.  (R. 260, 261, 263).  Additional visits occurred on August 25, September 28, and November 24, 2004. (R. 256, 258-59).  Sitsler was seen on January 24, 2005.  (R. 254).  On February 23, 2005, adjustment of Sitsler's anxiety medications was noted.  (R. 253).  Additional visits occurred on March 29 and April 29, 2005.  (R. 251, 528).  On May 9, 2005, Sitsler apparently had renewed complaints related to Lyme disease.  (R. 523).

On May 15, 2005, x-rays of Sitsler's lumbosacral spine were taken and compared to the October 2002 x-rays.  (R. 524).  The comparison showed slight dextrocurvature of the lower thoracic upper lumbar spine.  *Id.*  In August, 2005, x-rays of Sitsler's left hip showed hypertrophic changes of the lesser trochanter of the left femur consistent with ligamentous strain and/or injury.  (R. 517).  In August, 2005, the dextrocurvature of Sitsler's spine was described as "very mild" and unchanged from the May 2005 x-rays.  (R. 516).

On June 7, 2005, Sitsler had a follow up appointment for hypertension, anxiety, back pain, hypokalemia, and Lyme's disease.   (R. 521).  In the "purpose of visit" space on the form, polymorphic light eruptions were also noted.  *Id.*

Sitsler presented at Integris Grove Emergency Room on August 10, 2005 with a complaint of a bleeding ulcer.  (R. 396-99).  On August 26, 2005, Sitsler was seen for a follow-up appointment at the Jay Community Clinic.  (R. 515).  An MRI of Sitsler's lumbar spine conducted on September 21, 2005 showed no focal abnormality, and an MRI of his pelvis and hips was unremarkable.  (R. 394-95).  On December 21, 2005, Sitsler presented at Integris Grove Emergency Room with low heart rate and right shoulder and arm pain, and Sitsler apparently left without treatment after he felt better.  (R. 388-91).

Sitsler was seen for an apparent sinus infection on February 11, 2006.  (R. 379-86).  A chest x-ray on February 12, 2006 showed mild bibasilar subsegmental atelectasis (lung collapse).  (R. 387).

During this time, Sitsler was also seen at Mease Medical Clinic on 5 occasions on September 12, 2005, October 20, 2005, January 23, 2006, February 11, 2006, and February 21, 2006.  (R. 401-05).

Sitsler was apparently referred to Grand Lake Mental Health Center in February 2006, but never returned after his initial intake.  (R. 536-553).

Sitsler was seen for follow up on his medical issues at Jay Community Clinic on March 16, 2006, with additional Lyme disease testing.  (R. 505-07).  A follow up visit occurred on April 13, 2006.  (R. 500).

Sitsler was seen at Mease Medical Group in  June, 2006 for abdominal pain, nausea, and vomiting, and he was assessed with acute cholecystitis.  (R. 593-99).

A scan of Sitsler's right upper quadrant on June 21, 2006, showed findings consistent with biliary dyskinesia.  (R. 582).  An ultrasound showed no gallstones and no other acute findings.  (R. 583).  Sitsler presented at Grove Integris emergency room on July 5, 2006 complaining of "unbearable" abdominal pain.  (R. 425-31).  Sitsler's gallbladder was removed laparoscopically at Grove Integris Hospital on July 17, 2006.  (R. 421-24).  The pathology report diagnosis was chronic cholecystitis.  (R. 581).

Sitsler was seen at Jay Community Clinic on August 8, September 11, September 20, and October 5, 2006.  (R. 479, 482, 488, 496).

Sitsler was seen at the Mease Medical Clinic on October 25, 2006.  (R. 639-40).  His chief complaint was hand swelling and shoulder pain.  (R. 639).  The record also indicates that Sitsler asked for a referral to a kidney specialist.  *Id.*  One line in the record states: "has had abn labs from ihs and indicates he needs referral[] to nephrologist, no evid in labs that renal problem exists."  *Id.*  The assessment was shoulder pain and abnormal laboratory test findings without diagnosis.  (R. 640).

On November 3, 2006, x-rays of Sitsler's abdomen showed no evidence of renal lithiasis, a bladder ultrasound was negative, but a renal ultrasound showed possible nonobstructing right renal lithiasis or benign right renal mass, and a CT scan was recommended.  (R. 466-72, 511).  Sitsler followed up at Jay Community Clinic on November 6, 2006.  (R. 462).  A CT scan of Sitsler's abdomen and pelvis on December 12, 2006 showed no evidence of renal calculus or mass, fatty infiltration of the liver, and no other significant findings.  (R. 406).  Sitsler followed up at Jay Community Clinic on December 20, 2006.  (R. 458).

 A February 12, 2007 appointment at the Jay Community Clinic was described as routine, and several different complaints were discussed, including onset of bilateral knee pain.  (R. 449).

On March 15, 2007, Sitsler was seen for complaints of migraines and arthalgias. (R. 445). On May 2, 2007, Sitsler was seen for right foot pain. (R. 444). Sitsler then went to the Salina Community Clinic on May 17, 2007 for foot pain. (R. 642). X-rays taken at that time of Sitsler's right foot, right femur, tibia, fibula, pelvis, and right hip were normal. (R. 643-46).

Sitsler presented at Mayes County Medical Center emergency room on July 10, 2007 with a complaint of numbness on his left side that had started that morning. (R. 557-62). The clinical impression was dorsal myofascial strain, and Sitsler was discharged. (R. 560).

Sitsler was seen by David A. Traub, M.D. from April 3, 2007 through July 2007. (R. 563-70). At Dr. Traub's referral, Sitsler had an MRI of his brain on July 20, 2007, which was negative. (R. 567). An MRI of Sitsler's cervical spine showed mild left foraminal narrowing at C3/C4, with no other pathology. (R. 568). At Dr. Traub's referral, Sitsler was seen by Alan L. Martin, M.D., Board Certified in Rheumatology on August 27, 2007. (R. 622-29). Upon physical examination, Dr. Martin noted full grip closure bilaterally, as well as normal strength. (R. 623). His impression was a several-year history of arthralgias/myalgias, but his examination did not show clear signs of active inflammatory arthropathy, myopathy, or an inflammatory process such as rheumatoid arthritis. *Id.* Dr. Martin noted that he wanted to rule out ongoing spondyloarthropathy. *Id.* X-rays of Sitsler's hands on August 27, 2007, showed a cystic area, and mild arthritic changes in both hands, with no other significant bony abnormalities. (R. 628). A bone scan of Sitsler's feet on September 4, 2007, showed mild joint abnormalities in the first metatarsal phalangeal joints and in the left first carpal-metacarpal joint. (R. 629).

Sitsler was seen by Dr. Mease on September 7, 2007. (R. 635-38). Sitsler's gait was noted as limping and stooped, decrease range of motion was noted in several joints, and crepitus

was noted in his hands, wrists, shoulders, and entire spine.  (R. 637).  He was assessed as anxious and depressed, but with intact memory and good insight and judgment.  *Id.*  He was assessed with generalized arthritis at multiple sites, and generalized anxiety disorder.  *Id.*  An appointment on October 19, 2007, had very similar descriptions of the musculoskeletal examination and the psychiatric assessment.  (R. 630-33).  For the formal assessment, in addition to the previous assessments of  generalized anxiety disorder and generalized osteoarthritis at multiple sites  were added essential hypertension, benign; and sense of impending doom.  (R. 632).

In 2007, Sitsler was treated by a urologic specialist, who treated him with Flomax.  (R. 575-80).

On August 16, 2005, Sitsler was examined by agency consultant Muhammed Quadeer, M.D.  (R. 373-78).  Dr. Quadeer noted no edema was present.  (R. 375).  Sitsler's grip strength was 5/5.  *Id.*  Dr. Quadeer noted no tenderness or decreased range of motion in Sitsler's joints and back.  *Id.*  Sitsler's gait was normal.  *Id.*  Dr. Quadeer noted that Sitsler was anxious, but he was oriented, his memory was intact, and his thought processes appeared normal.  *Id.*

Agency consultant Denise LeGrand, Psy. D. conducted a mental status examination of Sitsler on June 8, 2005.  (R. 366-72).  Dr. LeGrand assessed Sitsler with generalized anxiety disorder and assessed his global assessment of functioning as 45.  (R. 370).  She stated that with adequate treatment, there was a good chance for improvement in Sitsler's condition.  (R. 370).  She also encouraged Sitsler to seek mental health treatment and commented that "[a]nxiety will interfere with his working effectively."  (R. 372).

C. M. Kampschaefer, Psy. D., an agency non-examining consultant, completed a Psychiatric Review Technique Form on May 5, 2006, for the time period of January through

September 1999, and he found that there was no medically determinable impairment because Sitsler had not made any mental complaints before September 1999.  (R. 352-65).  Janice B. Smith, Ph.D., a second agency non-examining consultant, completed both a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment on July 15, 2005.  (R. 164-77, 352-65).  Dr. Smith noted for Listing 12.06 that Sitsler had generalized anxiety disorder.  (R. 169).  For the "Paragraph B Criteria,"[1] Dr. Smith indicated that Sitsler had moderate restrictions on his activities of daily living, ability to maintain social functioning, and his ability to maintain concentration, persistence, or pace.  (R. 174).  Dr. Smith found no episodes of decompensation.  *Id.*  In the consultant's notes portion of the form, Dr. Smith reviewed Sitsler's history and the examination by Dr. LeGrand.  (R. 176).  Dr. Smith's conclusion was that Sitsler appeared "to be capable of simple work that does not require good short term memory or contact with many people."  *Id.*

For the Mental Residual Functional Capacity Assessment, Dr. Smith found that Sitsler was markedly limited in his ability to understand and remember detailed instructions, as well as his ability to carry out those instructions.  (R. 348).  Dr. Smith also found a marked limitation on Sitsler's ability to interact appropriately with the general public, and she found that Sitsler had a moderate limitation in his ability to maintain attention and concentration for extended periods.  (R. 348-49).  Dr. Smith believed that Sitsler was able to understand, remember and carry out simple tasks that did not require good short-term memory skills, and that he could work under

---

[1]    There are broad categories known as  the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

routine supervision.  (R. 350).  She found that he was able to complete a normal work day and work week, and that he could adapt to a work setting.  *Id.*  She said that Sitsler was "not able to relate effectively to the general public, but he [could] relate adequately to a small number of familiar coworkers and supervisors for work purposes."  *Id.*

Dr. Mease, whose office treated Sitsler from 2005 through 2007, completed a form entitled Residual Functional Capacity to Do Work Related Activities on September 7, 2007.  (R. 571-74).  The written explanations on the form are not completely legible, and they are difficult to read.  *Id.*  Dr. Mease circled numbers indicating that Sitsler could sit for 2 hours at a time and for a total of 4 hours in an 8-hour day, and stand and walk each for one hour at a time and one hour total in an 8-hour day.  (R. 571).  He indicated that Sitsler could occasionally carry up to 20 pounds, lift up to 50 pounds and could frequently lift or carry up to 10 pounds.  *Id.*  His opinion was that Sitsler's use of his hands and feet for repetitive movements was limited, that Sitsler could not crawl or climb at all, and Sitsler could only occasionally bend, squat, reach, handle or finger.  (R. 572).  He gave 100% restriction in Sitsler's ability to be exposed to marked changes in temperatures and humidity, a moderate restriction on vibrations, and mild restrictions on unprotected heights, moving machinery, exposure to dust, and in driving.  *Id.*  He checked a box indicating that Sitsler could not perform work on a sustained and continuing basis, and his written explanation appears to state severe osteoarthritis with joint erosions in his hands, vertebra of his neck and back, shoulders, knees and feet.  *Id.*

Dr. Mease indicated that Sitsler's pace of production would be affected by his impairments, and he checked a box that Sitsler's concentration was markedly impaired.  (R. 573).  The written explanation is difficult to decipher, but appears to refer to chronic pain and a difficulty with concentration.  *Id.*  Dr. Mease also indicated that Sitsler's condition would make

it difficult for him to complete work in a timely manner.  *Id.*  He anticipated that Sitsler's

conditions would cause him to be absent from work more than three times a month.  *Id.*  He

indicated that Sitsler's medications interfered with his ability to concentrate or reason

effectively.  *Id.*  The last section is unclear, because the word "no" is next to a question regarding

whether Sitsler has been unable to work on a full time basis since at least September 1, 1999, and

the year "1999" is underlined.  *Id.*  The word "yes" is next to the question: "Is [Sitsler] limited to

part-time work?"  *Id.*  Unfortunately, the written explanation under this section is not legible.  *Id.*

**Procedural History**

On March 17, 2005, Sitsler filed applications for Disability Insurance Benefits and

Supplemental Security Income under Title II, 42 U.S.C. § 401 *et seq.*,  (R. 58-60, 611-13).  In

these applications, Sitsler alleged disability beginning December 31, 1998.  Sitsler's applications

for benefits were denied in their entirety initially and on reconsideration. (R. 48-50, 52-55, 605-

10).  A hearing before ALJ John Volz was held September 18, 2007, in Tulsa, Oklahoma.  (R.

653-86).  By decision dated October 11, 2007, the ALJ found that Sitsler was not disabled at any

time through the date of the decision. (R. 18-26).  On August 6, 2008, the Appeals Council

denied review of the ALJ's findings.  (R. 6-8).  Thus, the decision of the ALJ represents the

Commissioner's final decision for purposes of further appeal.  20 C.F.R. § 404.981.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his

"physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in

14

any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability

claim.  20 C.F.R. § 404.1520.[2]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

(detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not

disabled, evaluation under a subsequent step is not necessary."  *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported

by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin*

*v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to

support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the

court will "meticulously examine the record in order to determine if the evidence supporting the

agency's decision is substantial, taking 'into account whatever in the record fairly detracts from

its weight.'"  *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  The court

---

[2]     Step One requires the claimant to establish that he is not engaged in substantial gainful
activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish
that he has a medically severe impairment or combination of impairments that significantly
limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is
engaged in substantial gainful activity (Step One) or if the claimant's impairment is not
medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's
impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P,
App.1 ("Listings").  A claimant suffering from a listed impairment or impairments
"medically equivalent" to a listed impairment is determined to be disabled without further
inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that
he does not retain the residual functional capacity ("RFC") to perform his past relevant work.
If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish
at Step Five that work exists in significant numbers in the national economy which the
claimant, taking into account his age, education, work experience, and RFC, can perform.
*See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied
if the Commissioner shows that the impairment which precluded the performance of past
relevant work does not preclude alternative work.  20 C.F.R. § 404.1520.

"may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Sitsler met insured status through September 30, 1999.  (R. 20).  At Step One, the ALJ found that Sitsler had not engaged in any substantial gainful activity since his alleged onset date of December 31, 1998.  *Id.*  At Step Two, the ALJ found that Sitsler had severe impairments of "arthralgia, anxiety, and status post Lyme's disease."  *Id.*  At Step Three, the ALJ found that Sitsler's impairments did not meet any Listing.  (R. 21).

The ALJ determined that Sitsler had the following RFC:

> to lift, carry, push, or pull 10 pounds occasionally and less than 10 pounds frequently; stand or walk 2 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday and is unable to deal with the general public and would require routine supervision.

(R. 22).  At Step Four, the ALJ found that Sitsler could not return to past work.  (R. 25).  At Step Five, the ALJ found that there were jobs that a person with Sitsler's RFC could perform.  (R. 25).  Therefore, the ALJ found that Sitsler was not disabled at any time through the date of his decision.  (R. 26).

### Review

Sitsler raises three primary issues on appeal.  First, Sitsler asserts that the hypothetical question to the vocational expert ("VE") was not complete and that therefore the ALJ's decision at Step Five is not supported by substantial evidence.  Second, Sitsler complains of the ALJ's treatment of the opinion evidence.  Third, Sitsler raises numerous complaints regarding the ALJ's credibility analysis.  The undersigned has carefully considered Sitsler's arguments and reviewed the ALJ's decision and the evidence.  Regarding some of Sitsler's assertions, the undersigned finds no error on the part of the ALJ.  Regarding the other issues, while the ALJ

committed error, the undersigned is convinced that any error was harmless pursuant to the law as reflected by Tenth Circuit case law.  Therefore, the decision of the ALJ is affirmed.

## The Hypothetical Directed to the Vocational Expert

At Step Five of the sequential evaluation process, the burden is on the Commissioner to show that work exists in significant numbers in the regional and national economies which the claimant can perform, taking into account the claimant's age, education, work experience and RFC.  *See Dikeman*, 245 F.3d at 1184; *Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999).  When a claimant's RFC is diminished by both exertional and nonexertional impairments, the Commissioner must produce expert vocational testimony to establish the existence of jobs in the national economy that the claimant can perform.  *Hargis v. Sullivan*, 945 F.2d 1482, 1491 (10th Cir. 1991).  For the VE's testimony to constitute substantial evidence, the ALJ's hypothetical question to the VE must relate with precision all of the claimant's limitations.  *Hargis* at 1492.

In the present case, the ALJ determined that Sitsler had the RFC to perform less than the full range of sedentary work due to nonexertional limitations:

> [Sitsler had the RFC] to lift, carry, push, or pull 10 pounds occasionally and less than 10 pounds frequently; stand or walk 2 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday and is unable to deal with the general public and would require routine supervision.

(R. 22).   It is unfortunate that the testimony of the VE here is not a sparkling example of clarity.  As Sitsler complains, the ALJ never put his RFC into a hypothetical question to the VE.  Instead, the ALJ proposed his hypothetical to the VE by reference to the RFC of a medical expert, Dr. Krishnamurthi, who testified at the hearing.  (R. 676).  Dr. Krishnamurthi's opinion was that Sitsler could sit six hours and stand and walk four hours out of an 8-hour day, occasionally lift 20 pounds, and frequently lift 10 pounds.  *Id.*  He found that there were no limitations on handling or reaching, that Sitsler could bend or stoop frequently, and that Sitsler should avoid

17

extreme sunlight.  (R. 676-77).   The VE was present at the hearing, heard Dr. Krishnamurthi's

testimony, and described it as the full range of sedentary and a reduced range of light.  (R. 682).

He described the reduction in light jobs as due to a "sit/stand" option that reduced the numbers

of those jobs by half.[3]  *Id.*  A careful reading of the testimony of the VE reveals that for other

jobs, the VE found that no reduction was needed, because they involved primarily sitting, so a

sit/stand option did not affect them.  (R 682-83).  The ALJ's RFC determination eventually was

for a range of sedentary jobs, and he did not rely on any of the jobs that the VE cited that were

within the light category.

Dr. Krishnamurthi's testimony did not include part of the RFC that the ALJ found,

stating that Sitsler was "unable to deal with the general public and would require routine

supervision."  This would normally be fatal to the ALJ's decision, because the testimony of the

VE is what allows there to be substantial evidence regarding the availability of jobs that can be

performed with the claimant's RFC.  When a hypothetical does not include all of the claimant's

impairments it "cannot constitute substantial evidence to support the Secretary's decision."

*Hargis* at 1492 (quotation omitted).

In this case, however, the original omission of the nonexertional limitation was cured by

additional testimony of the VE.  Sitsler's counsel asked the VE to add to Dr. Krishnamurthi's

RFC the additional limitations in the Mental Residual Functional Capacity Assessment

completed by Dr. Smith.  (R. 348-50, 683-84).  Dr. Smith had found marked limitations in

---

[3]      "Light" jobs require "a good deal of walking or standing."  20 C.F.R. § 404.1527(b).  Dr.
Krishnamurthi's testimony had only included four hours in an 8-hour day for walking or
standing, so the VE apparently believed that a reduction in half was required.  The ALJ,
however, did not include light jobs at all in his decision, but instead relied on the sedentary
jobs, and therefore any error related to the "sit/stand" option, which only addressed light
jobs, is not material.

Sitsler's ability to understand and remember detailed instructions, as well as his ability to carry out those instructions, and to interact appropriately with the general public, and a moderate limitation in his ability to maintain attention and concentration for extended periods.  (R. 348-49).  The VE indicated that he reviewed the Mental Residual Functional Capacity Assessment and was ready to testify regarding it.  (R. 683-84).  Sitsler's attorney asked how this would affect the occupational base, and the VE testified that the additional limitations would not affect the numbers of jobs.  *Id.*  The ALJ then further clarified by asking if the jobs to which the VE had testified were "uncomplicated jobs requiring routine supervision."  (R. 685).  The VE stated that the jobs were simple, indoors, and they did not require dealing with the public.  (R. 686).

The Court is therefore faced with a transcript of a hearing where both a medical expert and a vocational expert testified, and the ALJ never presented a full hypothetical to the VE that matched the RFC that he later found in his decision.  The undersigned would urge to the Commissioner that this is not an optimal way for disability hearings to proceed and that all ALJs should take the time at these hearing to carefully state the hypothetical RFC presented to the vocational expert so that it is clear in the transcript.  A complete question paired with a complete answer in the transcript is highly desirable.  The undersigned understands that at times the RFC determinations are extensive in their detailed findings and that resort to forms that have been previously completed by experts, or, in this case, to testimony of the medical expert, is a tempting shortcut.  That shortcut too often leaves the reviewing court with difficulty in determining if the people sitting in the hearing room all were asking questions, giving testimony, and listening to testimony regarding the same hypothetical RFC.  If the reviewing court cannot meaningfully review the proceedings below, then it is forced to find that the record does not contain substantial evidence supporting the ALJ's decision.  *See, e.g., Smith v. Barnhart,* 172

Fed. Appx. 795, 800 (10th Cir. 2006) (unpublished); *Miller v. Barnhart*, 43 Fed. Appx. 200, 204

(10th Cir. 2002) (unpublished); *Stubblefield v. Chater*, 105 F.3d 670 at *2 (10th Cir. 1997)

(unpublished) (vaguely-worded hypothetical did not elicit response that could constitute

substantial evidence).

  Here, the undersigned is convinced that a careful review of the transcript reveals that the

testimony of the VE does constitute substantial evidence, and any error in the way that the ALJ

presented the hypothetical questions to the VE was harmless error.  The Tenth Circuit discussed

the concept of harmless error in the context of social security disability appeals in *Fischer-Ross*

*v. Barnhart*, 431 F.3d 729 (10th Cir. 2005).  In *Fischer-Ross*, the ALJ had failed to include any

facts or analysis in Step Three, but had only included the statement that "a review of the medical

evidence fails to reveal the existence of an impairment or combination of impairments which

specifically meets or equals the criteria" of any listing. *Id.* at 731-32.  The district court held that

this was reversible error because the court could not adequately review the bare conclusion.  The

district court went on, however, to uphold the ALJ's determination at Steps Four and Five that

the claimant's RFC allowed her to perform a significant number of occupations.  *Id.* at 732.

The Tenth Circuit found that the ALJ's specific findings at those steps contradicted a conclusion

that the claimant's problems could meet the severity required to be conclusively presumed

disabled under any of the pertinent listings.  *Id.* at 734-35.  The Tenth Circuit's summation gave

a concise explanation of the concept of harmless error:

> In sum, the ALJ's confirmed finding at steps four and five of his analysis, coupled
> with indisputable aspects of the medical record, conclusively preclude Claimant's
> qualification under the listings at step three.  No reasonable factfinder could
> conclude otherwise.  Thus, any deficiency in the ALJ's articulation of his
> reasoning to support his step three determination is harmless.

*Id.* at 735.

Here the deficiencies in the ALJ's articulation of the hypothetical to the VE were harmless because eventually the VE testified that there were jobs in the economy that a person could perform who had an RFC of sedentary exertional ability, along with the additional limitations testified to by the medical expert and reflected in the Mental Residual Functional Capacity Assessment of Dr. Smith.  Given all of the testimony of the VE, no reasonable factfinder could find that there was not substantial evidence that jobs were available for a person with the ultimate RFC determined by the ALJ and included in his decision.  Therefore, the errors of the ALJ in how the testimony was elicited and in the imprecision of his language were harmless.  *See also Seever v. Barnhart*, 188 Fed. Appx. 747, 752 (10th Cir. 2006) (unpublished) (harmless error when VE's testimony regarding jobs included a limitation relating to job pressures, but ALJ's decision did not include the job pressures limitation)[4]; *Stokes v. Astrue*, 274 Fed. Appx. 675, 683-84 (10th Cir. 2008) (ALJ's inclusion of jobs with high noise levels at Step Five of his decision when the claimant had a limitation to exposure to noise was harmless error when no reasonable factfinder could have determined that there were not jobs in significant numbers within the claimant's RFC.).

A more minor issue mentioned by Sitsler is that the ALJ failed to ask the VE if his testimony was compatible with the Dictionary of Occupational Titles (the "DOT"), even though the ALJ's decision recited that they were consistent.  Plaintiff's Opening Brief, p. 3 (Dkt. #17). The undersigned agrees that he was not able to find this specific testimony by the VE, and

---

[4]      *Seever* also addresses one of Sitsler's more minor points, that the ALJ should have included the more detailed limitation of Dr. Smith in the Mental Residual Functional Capacity Assessment that Sitsler could "relate adequately to a *small* number of *familiar* coworkers and supervisors for work purposes."  Plaintiff's Opening Brief, p. 10 (Dkt. #17) (emphasis in original).  Because the VE testified that he had reviewed Dr. Smith's RFC and that it did not affect the numbers of jobs, any failure of the ALJ to use the more specific wording of Dr. Smith in his RFC determination was, at most, harmless error.

therefore it was error for the ALJ to include a conclusion in his decision that was not supported

by substantial evidence.  However, this too is harmless error, as explained by the Tenth Circuit

in *Martinez v. Astrue*, 316 Fed. Appx. 819, 825-26 (10th Cir. 2009).  In *Martinez*, as in the

present case, the ALJ had failed to ask the VE if his opinion was consistent with the DOT, as

required.  The Tenth Circuit said that the claimant had not identified any conflict and so the court

considered the ALJ's failure to be harmless.  *Id.* at 826.  Here, Sitsler's counsel specifically

asked the VE for the DOT numbers.  (R. 683).  Sitsler has not identified any reason why the

VE's testimony conflicted with the DOT or why such a conflict would affect the VE's testimony

at Step Five, and therefore this Court must conclude that the ALJ's failure to specifically inquiry

regarding consistency with the DOT was harmless error.

**<u>Opinion Evidence</u>**

Sitsler raises several issues regarding the ALJ's treatment of opinion evidence, the most

serious of which is the rejection of the opinion of Sitsler's treating physician, Dr. Mease.

A treating physician opinion must be given controlling weight if it is supported by

"medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent

with other substantial evidence in the record.  *Hamlin*, 365 F.3d at 1215.  *See also* 20 C.F.R. §

404.1527(d)(2).  Even if the opinion of a treating physician is not entitled to controlling weight,

it is still entitled to deference and must be weighed using the appropriate factors set out in

Section 404.1527.  *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004).  The ALJ is

required to give specific reasons for the weight he assigns to a treating physician opinion, and if

he rejects the opinion completely, then he must give specific legitimate reasons for that rejection.

*Id.*  When a treating physician's opinion is inconsistent with other medical evidence, it is the job

of the ALJ to examine the other medical reports to see if they outweigh the treating physician's

22

report, not the other way around.  *Hamlin*, 365 F.3d at 1215 (quotation omitted).

In the present case, it is clear that the ALJ completely rejected the medical opinion of Dr. Mease given in the form entitled Residual Functional Capacity to Do Work Related Activities on September 7, 2007.  (R. 24, 571-74).  The undersigned finds that the ALJ gave adequate specific legitimate reasons for rejecting this treating physician evidence.  *See White v. Barnhart*, 287 F.3d 903, (10th Cir. 2001) (Tenth Circuit would not reweigh evidence when the ALJ's discounting of treating physician's opinion was based on legitimate factors such as lack of objective medical evidence supporting treating physician's opinion, inconsistencies in the treating physician's records, and the relatively brief length of the doctor-patient relationship); *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (no error where ALJ "provided good reasons in his decision for the weight he gave to the treating sources' opinions").

First, the ALJ pointed out that Sitsler had last been seen at the office of Dr. Mease on October 25, 2006 for shoulder pain.  (R. 24).  The extent of the doctor-patient relationship is a legitimate factor.  Given that Dr. Mease had not seen Sitsler for over ten months at the time that he completed the form, the next specific reason given by the ALJ has added significance:  that Dr. Mease "apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported."  *Id.*  By saying that Dr. Mease's opinion was based on Sitsler's subjective complaints, the ALJ was by inference stating that his opinion was not based on objective medical findings.  This, again, is a specific legitimate reason for discounting a treating physician opinion. The ALJ's decision is filled with discussion of and specific references to the lack of objective medical findings.  The ALJ summarized the testimony of Dr. Krishnamurthi that Sitsler's Lyme disease by objective evidence had been treated, appeared to be in remission, and would not have

been expected to result in the effects claimed by Sitsler. *Id.* Dr. Krishnamurthi testified that all

of Sitsler's x-rays and MRIs were negative. *Id.* The ALJ referenced some of those x-rays and

MRIs directly. *Id.* The ALJ also referred to the evidence of a consultative examination that

showed both Sitsler's back and his extremities to be normal. *Id.* The ALJ therefore gave

specific and legitimate reasons for his rejection of the opinion evidence of Dr. Mease.[5]

## Credibility Determination

Sitsler raises several complaints regarding the ALJ's credibility analysis, but the

undersigned concludes that the ALJ's discussion and analysis in his decision were adequate.

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of*

*Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations].
> Not only does an ALJ see far more social security cases than do appellate judges,
> [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities
> of the claimant in a direct and unmediated fashion.

*White,* 287 F.3d at 910. In evaluating credibility, an ALJ must give specific reasons that are

closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995);

Social Security Ruling 96-7p, 1996 WL 374186.

The ALJ gave several specific reasons for his finding that Sitsler lacked credibility. He

first cited a specific medical record reference that Sitsler played outside with his young children

---

[5]     Sitsler also faults the failure of the ALJ to discuss, or to discuss in more detail, the physical
consultative examination, the consultative examination of Dr. LaGrand, and the Mental
Residual Functional Capacity Assessment of Dr. Smith. As discussed, above, however, the
VE eventually testified that all of the mental limitations found by Dr. Smith did not affect
the numbers of jobs available at Step Five. Dr. Smith's RFC findings were based on the
report of Dr. LaGrand, including her GAF determination, and the portion of the physical
consultative examination that Sitsler complains was omitted related to anxiety. Therefore,
even if it was error for the ALJ to fail to specifically discuss this evidence as Sitsler asserts,
any error was harmless when the VE's testimony addressed it. *Seever*, 188 Fed. Appx. at
752.

and contrasted that report with Sitsler's claim that he sits inside his house all day.  (R. 24).  He cited Sitsler's testimony that he cares for his children while his wife works.  He stated that there was no objective medical evidence to support Sitsler's claim that he had swelling of his knees or joints.  (R. 24-25).  He noted that Sitsler had gone for intake at a mental health treatment center, but had then failed to return for treatment.  (R. 25).  Sitsler frequented doctor's offices during the relevant time period, but his failure to return for psychological therapy is a legitimate point in a credibility analysis.  *Qualls v. Apfel*, 206 F.3d 1368, 1372-73 (10th Cir. 2000).

The ALJ then gave his main point, that Sitsler's complaints of pain were subjective and there was not objective medical evidence that would support a disabling level of pain.  (R. 25). As discussed above in relation to the ALJ's rejection of the opinion evidence of Dr. Mease, the ALJ did an adequate job of reviewing the lack of objective medical evidence, including summarizing the testimony of Dr. Krishnamurthi on this point, reviewing some of the negative x-rays and MRI results, and reviewing the lack of findings in the medical consultative examination.  *Mann v. Astrue*, 284 Fed. Appx. 567, 571 (10th Cir. 2008) (unpublished) (finding credibility determination adequate when ALJ discussed three points).

Sitsler's other arguments regarding credibility constitute "an invitation to this court to engage in an impermissible reweighing of the evidence and to substitute our judgment for that of the Commissioner," and the undersigned declines that invitation.  *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005).   The ALJ's credibility determination was supported by substantial evidence and was in compliance with the legal requirements.

**Conclusion**

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied.  The decision is **AFFIRMED**.

Dated this 13th day of January, 2010.

Paul J. Cleary
United States Magistrate Judge